**SEALED**

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
|  | ) | Case No. |
| KENNETH KNIGHT | ) | |
|  | ) | 16-016 MAG |
|  | ) | |
|  | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2010 to the present_____ in the parish of _____Orleans_____ in the _____Eastern_____ District of _____Louisiana_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Dispensing of controlled substances |
| 21 U.S.C. § 846 | Conspiracy to dispense controlled substances |

This criminal complaint is based on these facts:

See attachment.

☑ Continued on the attached sheet.

/s/ Kelly A. Halliday
_____
*Complainant's signature*

Kelly A. Halliday, Special Agent, D.E.A.
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   _____January 27, 2016_____

City and state:   _____New Orleans, Louisiana_____

_____
*Judge's signature*

Sally Shusan, U.S. Magistrate Judge
_____
*Printed name and title*

2cc: USM

Print   Save As...   Attach   Reset

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE
## FOR CRIMINAL COMPLAINT FOR KENNEY KNIGHT

1.      I, Kelly Halliday, being duly sworn, hereby depose and state as follows:

I am a Special Agent (SA) with the Drug Enforcement Administration assigned to the Tactical Diversion Squad of the New Orleans Field Division, New Orleans, Louisiana.   I have worked as a federal criminal investigator for the Drug Enforcement Administration since March 2012.   I received 17 weeks of specialized training at the Drug Enforcement Administration Training Academy in Quantico, Virginia including but not limited to, criminal law enforcement, drug law enforcement, and search and seizure law.   This specialized training covered all aspects of federal criminal investigations.   In connection with my official duties, I have investigated numerous criminal violations of Titles 21 United States Code as well as other federal and state laws.    I have directed and/or participated in numerous federal and state criminal investigations.

2.      Since February 2015, your affiant has been a member of the Tactical Diversion Squad (TDS).   TDS investigates individuals and organizations who attempt to divert legally controlled pharmaceuticals to the illegal drug market. As a member of TDS, your affiant has executed search warrants, directed Confidential Sources (CS'), conducted surveillance operations, monitored conversations between physicians and CS'/patients, and reviewed and made investigative decisions as to whether physicians were dispensing controlled substances for legitimate medical purposes. Your affiant has investigated and arrested numerous individuals for violations of federal narcotics laws.

3.      Your affiant is a federal law enforcement officer within the meaning of Title 21, United States Code, Section 878, and is empowered by law to conduct investigations and make arrests for violations of the federal Controlled Substance Act.

4.      This affidavit is made in support of a Criminal Complaint against Kenneth KNIGHT for conspiracy to unlawfully distribute and/or dispense controlled dangerous substances and maintaining a drug involved premises, in violation of Title 21, United States Code, Sections 846 and 856, respectively, while associated with AXCESS MEDICAL CLINIC (AMC)/Medical Office of Barbara A. Bruce, M.D.  AMC is a pain management clinic located at 9954 Lake Forest Boulevard, Suite 10, New Orleans, Louisiana 70127.  Since this affidavit is submitted for this limited purpose, your affiant has not included each and every fact known concerning this investigation.  Your affiant has set forth the facts that she believes are essential to establish probable cause for obtaining an arrest warrant.   Your affiant has determined the facts set forth in this affidavit are a result of her participation in this investigation, which has included, but is not limited to, the following sources, which your affiant believes to be reliable:

a.  Oral and written reports and information about this and other investigations your affiant has received from members of the NOFD TDS and TDS in Mississippi, members of the United States Marshal's Service, members of the Mississippi Board of Medical Licensure, and members of the Louisiana State Board of Medical Examiners (LSBME); and the Louisiana Department of Health and Hospitals (DHH), Health Standards Section (HSS);

b. Oral and written reports about the financial activities and transactions between individuals listed in this affidavit that your affiant has received from members of the NOFD TDS;

c. Physical surveillance conducted by your affiant and other members of the NOFD TDS that has been reported to your affiant directly or indirectly;

d. Public records and law enforcement records;

e. Debriefings of Sources of Information (SOI), CS-86-042957 (CS1), CS-14-148852 (CS), a UC Agent, and individuals associated with AXCESS MEDICAL CLINIC (AMC)

f. Review of audio and video recordings of CS and UC agent visits to AMC

g. Oral and written reports about the telephone call records and subscriber information of individuals listed and not listed in this affidavit that your affiant has received from members of the NOFD TDS;

5.     Since 2010, NOFD TDS Agents have been investigating AMC because it was believed to be dispensing controlled substances without a legitimate medical purpose and outside the scope of a professional medical practice, as required by 21 C.F.R. § 1306.04.     When this investigation was initiated, Agents learned that KNIGHT owned/operated pain clinics in Louisiana, to include AMC.  Following the initiation of the investigation of AMC, the clinic was moved to Picayune, Mississippi, where the clinic was to operate under Mississippi state law. AMC continued to operate as a pain management clinic while in Mississippi, and agents worked

with Mississippi law enforcement and state regulatory agencies to investigate AMC.

6.      In September 2014, agents learned that AMC moved from Mississippi to 9954 Lake Forest Boulevard, Suite 10, New Orleans, Louisiana 70127.   Agents also learned that Dr. Barbara A. Bruce was the new physician for AMC.   Agents then conducted multiple checks with the Louisiana Secretary of State Database for the business named AMC with the result revealing that KNIGHT was listed as the registered agent and director of AMC and that Barbara Noble was listed as the secretary of AMC.   The listing includes that AMC had been registered with the Louisiana Secretary of State, Commercial Division as a business corporation since February 12, 2004, with the charter number 35646224D and was listed to be 'In Good Standing'. The listing also revealed that the principal address for AMC to be 9954 Lake Forest Boulevard, Suite 10, New Orleans, Louisiana 70127, and listed KNIGHT's residential address, 15253 Highway 73, Prairieville, Louisiana 70769, as the domicile address and the mailing address for AMC.

7.      Over the next several months, agents conducted surveillance on multiple occasions of 9954 Lake Forest Boulevard, Suite 10, New Orleans, Louisiana 70127. Surveillance observations revealed a sign was in the window next to the front doors of the location, indicating that the business was the Medical Office of Barbara A. Bruce, M.D.   Agents confirmed that Bruce worked at the clinic and that KNIGHT periodically showed up at the clinic. Agents also identified office manager/triage nurse, Theresa "Tammy" Schlosser, office assistant Josie Blange, and office assistant Ashly Dull as other staff members working at AMC.

8.      By December 2014, in addition to the aforementioned business database checks and surveillance operations, agents conducted undercover (UC) operations at AMC/Medical Office of Barbara A. Bruce, M.D and financial checks on Bruce and KNIGHT.   As a result of the UC operations, agents not only learned that Bruce and Schlosser operated AMC outside the scope of a professional medical practice but that AMC owner KNIGHT was also involved with the medical and administrative decisions that determined   whether or not prescriptions for controlled substances were unlawfully dispensed/distributed to some patients.  As a result of the financial checks, agents learned that KNIGHT profited from the unlawful activities at the clinic. Agents corroborated that the fact that KNIGHT owned/leased the office space located at 9954 Lake Forest Boulevard, Suite 10, New Orleans, Louisiana, which is where AMC/Medical Office of Barbara A. Bruce, M.D., was housed and conducted its unlawful activities.   Agents also learned that KNIGHT paid AMC employees Schlosser, Blange, and Dull.

9.      In regards to UC operations, on December 11, 2014, CS2 visited AMC/Medical Office of Barbara A. Bruce, M.D with a Undercover (UC) agent.   Prior to the initial office visit, agents observed Bruce enter AMC/Medical Office of Barbara A. Bruce, M.D.  During the visit, Bruce never met with CS2 to assess his/her complaint of pain or areas of pain.  No staff member asked for or checked to see if CS2 brought his/her MRI as instructed to do so prior to this visit. CS2 obtained a prescription for 198 tablets of 30mg Oxycodone, 100 tablets of 10mg/325mg Norco, 75 tablets of 10mg Baclofen, and 60 tablets of 2mg Alprazolam.  Schlosser provided CS2 with his/her prescription that day and gave the reason that Bruce was not present was that she had strep throat.   The UC agent stated that he/she heard Schlosser tell everyone inside of

AMC/Medical Office of Barbara A. Bruce, M.D that Bruce would not be seeing anyone that day. The UC agent also stated that Bruce did not meet with anyone that day to his/her knowledge.   A review of the intelligence information from the Louisiana Board of Pharmacy regarding Bruce's prescribing for that day revealed that other patients received prescriptions from Bruce that were the same or very similar to what CS2 had received.

10.     On January 12, 2015, CS2 visited AMC/Medical Office of Barbara A. Bruce, M.D with an UC agent for a follow-up visit.   Prior to this visit, Agents observed that Bruce's vehicle was parked in the parking lot.   During the visit, Bruce never met with CS2 to assess his/her complaint of pain or areas of pain.   Schlosser provided CS2 a prescription for 168 tablets of 30mg Oxycodone, 90 tablets of 10mg/325mg Norco, 75 tablets of 10mg Baclofen, and 56 tablets of 2mg Alprazolam. The prescription was dated 12/11/2014, which was the same date as CS2's initial visit to AMC/Medical Office of Barbara A. Bruce, M.D.   The prescription was for a 28-day supply.   The UC agent accompanying CS2 stated that he heard a male ask about Bruce's absence in AMC/Medical Office of Barbara A. Bruce, M.D.

11.     On January 27, 2015, CS1 visited AMC/Medical Office of Barbara A. Bruce, M.D after being denied a visit with Bruce on January 6, 2015 for being accused by Schlosser of testing positive for marijuana.   According to CS1 and audio and video recordings from the visit on January 27th, CS1 met with Schlosser first and eventually Bruce.   During the visit, Schlosser told CS1 that she was going to redo his/her sheet (patient paperwork) to make it look like he/she hadn't failed the drug test.   Schlosser was observed contacting Bruce via cell phone.   Based on the audio and video recording and call detail records on Schlosser's phone (985-774-9079),

6

Schlosser contacted Bruce at number 504-251-4745 and discussed with her changing CS1's hard copy sheet and electronic file.  Bruce was then heard asking Schlosser if they should ask "Kenny" if it was okay.  Schlosser was then heard telling Bruce "Well no because remember he was okay with the other guy that failed.  He said have him come back."  Schlosser and Bruce eventually ended their conversation with Schlosser telling Bruce that she was going to call "Kenny."  Toll analysis of Schlosser's phone indicated that "Kenny" was in fact KNIGHT. Shortly thereafter, Schlosser was heard talking to KNIGHT via cell.  Based on toll analysis on Schlosser's phone, she contacted KNIGHT's number 504-250-3846 and told him that she was in her office with the door closed and that Bruce told her to call him about him and to see if it was okay with him that for Bruce to see CS1.  Schlosser told KNIGHT that Bruce just wanted to run it by him to make sure that "Josie" (Josie Blange) take "it" (the initial drug screen failure) out of the computer as a decline.  Schlosser and KNIGHT discussed the $300 charge and redoing CS1's green sheet.  Schlosser ended the phone call by telling KNIGHT "Ok thanks, I got to call her back, alright bye."  Later that day, as CS1 met with Bruce, Bruce was observed going over and signing CS1's redacted paperwork so that it appeared that CS1 did not fail the previous urine drug test.  Bruce never conducted a physical exam of CS1 at any point, and Bruce told CS1 "between you and me I could care less how much weed you smoke as long as you come in here and you can pass a urine drug screen."  Bruce also told CS1 that she believed marijuana was good for pain.  Bruce continued by telling CS1 that they were going to give him/her a heads up the next time they planned to urine drug test him/her.  While talking to Bruce, CS1 jokingly mentioned that he/she was going dancing when he/she was a hundred years old.  In response,

Bruce told him/her "maybe by then you'll be able to smoke a fat one on the dance floor."  As Bruce went over the prescription with CS1, she told CS1 "I'm going to have to start you off on 10's (10 milligrams) and we'll work you up, ok?"  Bruce also removed and tore up documents related to CS1's medical history from the patient's file.  As Bruce tore up the documents, she told CS1 that he/she wouldn't need the documents.  Bruce then told CS1 that she was going to give him/her a urine drug test kit to take home for testing purposes prior to being urine drug tested again at AMC/Medical Office of Barbara A. Bruce, M.D.  Before CS1 left AMC/Medical Office of Barbara A. Bruce, M.D that day, Schlosser, in Bruce's presence, placed a urine drug test kit in a white garbage bag and gave it to CS1.  As a result of Schlosser conferring with Bruce and then with KNIGHT about altering CS1's drug test results, and then in fact altering the results to conceal the results, CS1 received a prescription from Bruce for 140 tablets of 10mg Oxycodone, 56 tablets of 2mg Alprazolam, and 56 tablets of 350 mg of Soma.

12.     On February 10, 2015, CS2 visited AMC.  Prior to CS2 and the UC arriving at AMC/Medical Office of Barbara A. Bruce, M.D, agents observed Bruce's vehicle parked in the parking lot.  During the visit, Bruce never met with CS2 to assess his/her complaint of pain or areas of pain, however, Schlosser provided CS2 a prescription, for 29 days, of 168 tablets of 30mg Oxycodone, 87 tablets of 10mg/325mg (Hydrocodone/Acetaminophen (Norco), 72 tablets of 10mg Baclofen, and 58 tablets of 1mg Alprazolam.  Schlosser told CS2 that he/she received a 29 day supply because he/she had rescheduled from the day before.

13.     On February 24, 2015, CS1 visited AMC/Medical Office of Barbara A. Bruce, M.D.  During the visit, Bruce did not met with CS1 to assess his/her pain or areas of pain, but

Schlosser provided CS1 a prescription, for 28 days, of 140 tablets of 10mg Oxycodone and 56 tablets of 2mg Alprazolam.   According to CS1, Schlosser did not give him/her Soma because of a new Louisiana state "Trinity Law," which prevented prescribers from prescribing Soma along with Xanax.

14.     On March 11, 2015, CS2 visited AMC/Medical Office of Barbara A. Bruce, M.D., but surveillance units were unable to locate Bruce's vehicle parked in the parking lot. During the visit, Bruce did not meet with CS2 to assess his/her complaint of pain or areas of pain at any time, but Schlosser provided CS2 with a prescription, for 28 days, of 168 tablets of 30mg Oxycodone, 84 tablets of 10mg/325mg Hydrocodone/Acetaminophen (Norco), 70 tablets of 10mg Baclofen, and 56 tablets of 1mg Alprazolam.     The UC accompanying CS2 stated that after CS2 received his/her prescription, he/she (UC) spoke with Schlosser about the UC becoming a new patient.  According to the UC, Schlosser suggested to him/her where to obtain radiology products (MRI, X-Ray, or CT Scan) and Schlosser also told the UC that complaining of back pain worked best when trying to receive a referral for pain management.  While at AMC/Medical Office of Barbara A. Bruce, M.D, the UC also spoke with a patient who told the UC that he, the patient, picked up and sold his pills in Houston, Texas.

15.     On March 24, 2015, CS1 visited AMC/Medical Office of Barbara A. Bruce, M.D. During the visit, Bruce did not meet with CS1 to assess his/her pain or areas of pain, but Schlosser provided CS1 a prescription, for 28 days, for 154 tablets of 15mg Oxycodone and 56 tablets of 2mg Alprazolam.    For this prescription, Bruce increased CS1's Oxycodone

prescription from 10mg to 15mg and the quantity from 140 tablets to 154 tablets without CS1 discussing with or requesting from Bruce.

16.     On April 8, 2015, CS2 visited AMC/Medical Office of Barbara A. Bruce, M.D. Initially surveillance units did not observe Bruce's vehicle parked in the parking lot, but during the visit, Bruce did eventually arrive but never met with CS2 to assess his/her complaint of pain or areas of pain.   According to CS2, as he/she talked with Schlosser in an office, Bruce came to the doorway and had a brief conversation with Schlosser. At that time, Bruce greeted CS2, but did not evaluate the patient. Schlosser then provided CS2 with a prescription for 168 tablets of 30mg Oxycodone, 84 tablets of 10mg/325mg Hydrocodone/Acetaminophen (Norco), 70 tablets of 10mg Baclofen, and 56 tablets of 1mg Alprazolam.  The prescription was for 28 days and was dated 4/8/2014, not 4/8/2015.  Schlosser had provided CS2 with the pre-signed prescription before Bruce appeared in the doorway of the office area where Schlosser and CS2 met.

17.     On April 21, 2015, CS1 visited AMC/Medical Office of Barbara A. Bruce, M.D. According to CS1 and the audio and video recording, before CS1 entered AMC/Medical Office of Barbara A. Bruce, M.D, he/she spoke with a male, who agents later identified as KNIGHT. According to the audio and video recording, CS1 asked KNIGHT, who was standing near AMC/Medical Office of Barbara A. Bruce, M.D, if the doctor was there. KNIGHT told CS1 "no" before asking CS1 if he/she had an appointment that day and if "they" tried to call him/her. CS1 informed KNIGHT that he/she had not been called.  KNIGHT then told CS1 to come inside and led CS1 through the front door of AMC/Medical Office of Barbara A. Bruce, M.D.  Once inside of AMC/Medical Office of Barbara A. Bruce, M.D., KNIGHT asked CS1 what his/her

name was before announcing CS1's presence. Seconds later, Schlosser was heard on the recording saying CS1's name and "this is Tammy." Schlosser was then observed on the recording coming from another area of AMC/Medical Office of Barbara A. Bruce, M.D. Schlosser informed CS1 that his/her appointment had been rescheduled for Thursday, April 23, 2015, but that he/she was welcome to come back the following day. Before CS1 left AMC/Medical Office of Barbara A. Bruce, M.D, KNIGHT and Schlosser informed CS1 that Bruce had an emergency, among other things.

18.     On April 22, 2015, CS1 returned to AMC/Medical Office of Barbara A. Bruce, M.D.  According to CS1 and the audio and video recording, a female acting as the triage nurse, attempted to take his/her blood pressure while asking him/her medical questions.  According to CS1, later in the visit, Bruce met with him/her but did not assess his/her pain or areas of pain. According to CS1, he/she mentioned to Bruce that he/she drove to AMC/Medical Office of Barbara A. Bruce, M.D the previous day. According to CS1, Bruce then reached in her purse and gave him/her twenty ($20) dollars. CS1 also said that he/she also told Bruce that she could increase his/her daily dosages.  According to CS1, Bruce agreed and subsequently increased the total quantity of Oxycodone for CS1.  Bruce then provided CS1 with a prescription, for 28 days, of 168 tablets of 15mg Oxycodone and 56 tablets of 2mg Alprazolam. Bruce had already increased CS1's Oxycodone quantity by 14 tablets from the prior visit.

19.     In regards to the financial checks on Bruce and KNIGHT, agents learned that around August/September 2014, around the time that Bruce began working at AMC and prescribing controlled substances, she used JP Morgan Chase Bank account number 650839103

to make daily deposits of cash proceeds derived from the unlawful activities at AMC/Medical Office of Barbara A. Bruce.   Bruce deposited a total of $129,607.00 in cash into the aforementioned account, with activity beginning August 2014 and becoming the predominant source of funds deposited into the aforementioned account from September 2014 through February 2015.  The total cash deposits for the time period September 3, 2014 to January 21, 2015 totaled $109,228.00.   Agents learned that during the period that these cash proceeds deposits were being made, Bruce also wrote numerous checks, totaling $80, 372.08, from the aforementioned bank account to AMC and KNIGHT who was using a Hancock/Whitney Bank account number 47381182.   Noble was also an authorized signer on this Hancock/Whitney account.   Furthermore, agents learned that AMC/KNIGHT's Hancock/Whitney Bank account number 47381182 made regular payments to Lodie Enterprises.   The investigation has shown that Lodie Enterprises is the owner of the office space located at 9954 Lake Forest Boulevard, New Orleans, Louisiana, where AMC/Medical Office of Barbara A. Bruce was housed and conducted its unlawful activities.   Agents also learned that AMC/KNIGHT's Hancock/Whitney Bank account number 47381182 showed payments to AMC employees Schlosser, Blange, and Dull.  As previously mentioned, KNIGHT and AMC operated in Picayune, Mississippi at one point.  Through these financial checks, agents also learned that AMC had an account at the First National Bank of Picayune as well.  The First National Bank of Picayune account number was 1023462.   Agents learned that KNIGHT transferred money on several occasions from AMC/KNIGHT's Hancock/Whitney Bank account to AMC's First National Bank of Picayune account during the aforementioned time period.

20.    By the end of May 2015, Schlosser and Bruce were arrested for charges associated with this investigation.   Subsequent to those arrests, on multiple occasions between May 2015 and October 2015, agents interviewed Schlosser, Bruce, KNIGHT, and others associated with AMC regarding activities at AMC/Medical Office of Barbara A. Bruce, M.D. The individuals interviewed made statements demonstrating KNIGHT's leadership role and involvement in the unlawful activities at AMC/Medical Office of Barbara A. Bruce, M.D.  Some of the statements made by some of the individuals who were interviewed are listed below.

21.    On multiple dates between late May 2015 and August 2015, agents interviewed Schlosser who stated to agents that from the beginning, it was understood by Bruce, KNIGHT and Noble that KNIGHT would continue to be the owner of AMC even though everything on paper stated Bruce was the owner.  Schlosser said that Bruce allowed KNIGHT to place the sign in the window indicating that AMC was to be known as the 'Medical Office of Barbara A. Bruce, M.D. Schlosser also stated that KNIGHT and Noble had access to the AMC computers, and the 'main computer receptor' or 'main frame' was housed at KNIGHT's residence. Schlosser also told agents that since Noble worked from home, Blange faxed sign in rosters and close out sheets to KNIGHT's residence every day.

22.    Schlosser also stated to agents that because KNIGHT wanted more revenue from AMC he pressured Bruce to see more patients, which eventually caused Bruce and KNIGHT to get into a dispute.  Schlosser stated to in order to keep patients at AMC, KNIGHT would shred new patient prescription records if he thought those records indicated that the new patient was seeing another doctor.  Schlosser also stated to agents that KNIGHT directed Blange to also

shred patient/AMC documents.  Schlosser stated to agents that KNIGHT told Bruce to prescribe

the same controlled substances to patients that his previous Mississippi doctor, Dr. Fitzhugh

Neal, had written.   Schlosser told agents that some patients at AMC were friends of KNIGHTs

and was associated with KNIGHT outside of AMC.  Schlosser also stated to agents that at least

one was a referral by KNIGHT.  Schlosser continued by stating that KNIGHT would lend money

to some of his friends who were patients of Bruce so they could see Bruce and receive controlled

substances.  Schlosser also stated that one of KNIGHT's friends, who was a patient of Bruce's,

wrote KNIGHT a check that bounced.  Schlosser continued that KNIGHT then told his friend

that he would have to repay him even if he, the friend, had to sell his medicine to get the money.

23.     Between August 2015 and October 2015, agents interviewed Dull, who worked

for KNIGHT at AMC in Mississippi and AMC in New Orleans as a part-time employee.  Dull

stated to agents that KNIGHT was involved with AMC operations in both Mississippi and

Louisiana and that his policies in Mississippi were the same as in Louisiana. Dull confirmed that

at AMC in Mississippi, she observed KNIGHT remove and destroy pages from old patient files,

including urine drug screenings, information from calls from pharmacies about patients, green

sheets, and other discriminating information so that those individuals could remain patients.

Dull also stated that KNIGHT would occasionally do "mailers" to old patients of AMC in an

attempt to get those old patients to return to the clinic. Dull told agents that KNIGHT had taken

boxes of declined and discharged patient packets from AMC in Mississippi to AMC in New

Orleans so Blange could enter the patients into the computer system. Dull told agents that by the

time she went to work at AMC/Medical Office of Barbara A. Bruce, M.D., she realized that

many of those declined and discharged patients from Mississippi were now patients of AMC/Medical Office of Barbara A. Bruce, M.D. Dull also confirmed that KNIGHT had friends who were patients at AMC in Mississippi clinic that he did not allow to be discharged. This investigation has revealed that several of those friends who were patients of AMC Mississippi clinic later became patients of Bruce, and they communicated to KNIGHT directly via cell phone.

24.     Dull stated that while she worked at AMC in New Orleans, KNIGHT came to AMC every Friday to pick up his half of the profits from the clinic. Dull told agents that Noble would also fax an invoice to be fulfilled by Bruce each week. Dull also recalled overhearing KNIGHT tell Bruce that if a patient asked for an additional pill a day then Bruce should prescribe them the additional pill. Dull stated to agents that KNIGHT would even set the schedule for some of the patients because he wanted patients to be seen starting at 8 am each morning. Dull continued that Bruce would not arrive that early, but these patients still received their prescriptions whether Bruce was at AMC or not.

25.     Between June 2015 and August 2015, agents interviewed KNIGHT in regards to his involvement with AMC/Medical Office of Barbara A. Bruce, M.D. During an interview with KNIGHT, KNIGHT also confirmed that prior to Bruce opening AMC/Medical Office of Barbara A. Bruce, M.D.,  AMC in New Orleans had been closed for a long time and was in the red for $140,000 dollars.  KNIGHT stated to agents that as a result of his and Bruce's agreement, he netted between $50,000 and $80,000 in over eight months. KNIGHT also stated to agents that when he met Bruce he initially declined her to work for him at AMC as she did not have hospital

staff privileges and was not qualified by Department of Health and Hospital (DHH), Health Standards Section (HSS0 for a pain management clinic.  KNIGHT stated to agents that Bruce informed him that following a discussion with her attorney she could not sign the documents establishing herself as an employee without said hospital staff privileges.  KNIGHT stated that he could not open up the AMC facility and Bruce could not enter into a contract with AMC until she obtained hospital staff privileges, became credentialed, and received an approval letter from DHH. KNIGHT also stated to agents that Bruce's alternative was to take over the facility and "inherit the practice."   KNIGHT told agents that it was a known fact that once Bruce began working at the AMC/Medical Office of Barbara A. Bruce, M.D., she would inherit the old patients and establish new ones.  KNIGHT also stated that Bruce eventually signed an agreement to rent the AMC facility on a week to week basis. At this point KNIGHT's attorney drafted an agreement that allowed Bruce to rent the AMC facility for 50% of the profit.

26.     KNIGHT stated to agents that he was aware of Bruce's activities but "wanted proof."  KNIGHT also stated though that he had witnessed a patient come into AMC/Medical Office of Barbara A. Bruce, M.D., and received a prescription without meeting with Bruce. In regards to a patient failing the urine drug test, KNIGHT said the marijuana incident was not shocking because he knew a lot of doctors in this town who saw patients after the patient failed tests for marijuana.  KIGHT continued by stating to agents that some of the doctors who had worked for him in the past had let some patients slide with marijuana and that he knew of other doctors who saw patients every day after the patient tested positive for marijuana.  KNIGHT also stated to agents that he even knew a doctor who knew his patient(s) used cocaine.  In regards to

the aforementioned January 27, 2015 CS1 visit to AMC/Medical Office of Barbara A. Bruce, M.D., KNIGHT stated to agents that Schlosser did not tell him of a situation in which Bruce prescribed controlled substances to a patient who had tested positive for marijuana during a drug test. KNIGHT said he found out about the marijuana incident the day after Bruce saw the patient.

27.     During the interview, KNIGHT also confirmed that he was aware of the number of patients Bruce saw, and that Noble would send Bruce invoices based on the number of patients from the close out sheets and maintenance fees. KNIGHT told agents that he did not get involved with patients or Bruce's operations before he contradicted himself by stating that approximately 5-6 patients did have his cell phone number. Toll analysis of KNIGHT's cell phones revealed that several of Bruce's patients were in communication with KNIGHT directly via cell phone. KNIGHT stated to agents that he did not refer patients to Bruce but later contradicted himself when he stated that he had referred a patient to Bruce. This investigation has revealed that the patient whom KNIGHT referred to Bruce also had prescriptions filled for controlled substances from another doctor who works for KNIGHT at another one of KNIGHT's clinics, the Louisiana Men's Clinic. KNIGHT also stated that AMC was "grandfathered" in as a pain clinic under a June 15, 2005 exemption.

28.     In mid-August 2015, agents spoke with DHH, HSS Manager Rita Simon, who oversees Louisiana Pain Management Clinic Licensing, as well as DHH, HSS Supervisor Dora Kane, who supervises all Louisiana Long-term Care Programs concerning the June 15, 2005 exemption. Simon and Kane confirmed that the previous doctor working for KNIGHT at AMC

in New Orleans had been approved because she had met DHH HSS requirements, which included having medical staff privileges. Simon then confirmed that as long as the previous doctor remained at AMC the clinic remained exempt. Simon and Kane confirmed that as of August 2014 the June 15, 2005 exemption had been closed. Additionally, Simon and Kane confirmed KNIGHT had not contacted them regarding Bruce. Simon and Kane agreed that at the point KNIGHT had replaced/changed the previous doctor with Bruce he and /or Bruce should have contacted DHH HSS, as he had done in the past, concerning the replacement/change. Simon and Kane stated that during that notification, they would have reminded him or Bruce that Bruce had to meet the same requirements as the previous doctor in order for AMC to remain exempt. Alternatively, Simon stated that since KNIGHT was aware of the DHH HSS requirements, which included a doctor having medical staff privileges, KNIGHT should have ensured that Bruce met all the requirements before allowing AMC/Medical Office of Barbara A. Bruce, M.D., to open.

29.     In September 2015, agents interviewed Bruce in regards to AMC/Medical Office of Barbara A. Bruce, M.D. Bruce stated to agents that she first spoke to KNIGHT in late 2013 about employment at AMC in New Orleans. Bruce also stated to agents that KNIGHT told her she only needed hospital staff privileges to work at AMC as the clinic was not owned by a doctor. Bruce said she planned to work for KNIGHT and AMC because KNIGHT told her she would be the 'Medical Director' of the clinic. Bruce stated that following the first meeting, Bruce, KNIGHT, and Noble met again in late 2013 where KNIGHT and Noble tried to pressure her to sign an initial contract employing her as the medical director for AMC. Bruce said she did

not sign the contract at the time as she did not have the hospital staff privileges needed and was unable to obtain them.

30.     Bruce stated that a few days later KNIGHT contacted her saying that he had talked to his lawyer and that there was a way to allow her to work at AMC while still being 'by the book'.  Bruce told agents that KNIGHT told her the clinic would be put into her name and she would pay him fifty percent (50%) of the proceeds to give the illusion that she was renting the office space and office staff.  Bruce said she eventually signed the contract because KNIGHT made her feel like they were family and told her that she could trust him.  Bruce confirmed with agents that included in the contract was that the clinic name would change to the 'Medical Office of Dr. Barbara Bruce.'  Bruce told agents that KNIGHT had his own office at AMC and that he came to the clinic 2-3 times a week.

31.     Bruce continued by stating to agents that after some time she began to feel uncomfortable working at AMC/Medical Office of Barbara A. Bruce, M.D. Bruce felt uncomfortable with non-medical personnel, like KNIGHT and Blange, making medical decisions.  In example, Bruce told agents that KNIGHT had told her that AMC was not like neurology and that she did not have to perform any medical examinations.  Bruce also stated to agents that Blange would check the patient's prescriptions prior to the patient leaving the clinic and would require Bruce to rewrite the prescription if the next appointment was scheduled longer than the 30 days stated on the prescription.  Bruce stated to agents that if she refused to make changes then Blange would contact KNIGHT about the issue.

32.     Bruce also stated to agents that KNIGHT was absolutely aware of the activities that were going on at AMC/Medical Office of Barbara A. Bruce, M.D and was directly involved with patients testing positive for marijuana during the drug screening process.  Bruce said that Schlosser conducted the urine drug screens on the patients and if a patient tested positive for marijuana, KNIGHT would bring the patient into his office to talk to them. Following KNIGHT's discussion with the patient, the patient would be sent away that day and would be allowed to return another day for their appointment.  Bruce stated that KNIGHT permitted more than a handful of patients who tested positive for marijuana to return to the clinic as patients.

33.     Bruce further stated to agents that another reason she began feeling uncomfortable was because she started seeing that KNIGHT protected the patients he knew as long term patients even if Bruce felt the patient should be discharged for cause.  For example, Bruce stated that Schlosser received a call concerning a husband and wife who were both patients of AMC/Medical Office of Barbara A. Bruce, M.D., and who were selling their medications out of a trailer.   Bruce said that after receiving the call, she had Blange call both of them in for a pill count and drug test.  Bruce stated that the husband and wife both failed the pill counts and drug test, so she discharged them.  Bruce then stated to agents that they threatened to turn her in to the Louisiana Medical Board for patient abandonment.  Bruce stated to agents that she had heard that KNIGHT had told some patients to say that to other doctors.  Bruce said that after she discharged the patients, Blange called KNIGHT who spoke to her and tried to get her to just give the husband and wife a warning. Bruce said that she told KNIGHT "absolutely not."   Bruce said that sometime later the husband and wife came back in AMC/Medical Office of Barbara A.

Bruce, M.D., and told her that KNIGHT had told them to come back because Bruce was a "sucker" and didn't have the gut to turn the away. Bruce stated to agents that she still did not see the husband and wife as patients.

34.     Based upon the foregoing, your affiant submits that there is probable cause to believe that KNIGHT has committed the following offenses:  conspiracy to unlawfully distribute and/or dispense controlled substances and maintaining a drug involved premises, in violation of Title 21, United States Code, Sections 846 and 856, respectively, made applicable by 21 C.F.R. § 1306.04.

/s/ Kelly A. Halliday
Kelly A. Halliday, Special Agent
Drug Enforcement Administration

Pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3), the undersigned judicial officer has on this date considered the information communicated by reliable electronic means in considering whether a complaint, warrant, or summons will issue.  In doing so, I have placed the affiant under oath, and the affiant has confirmed that the signatures on the complaint, warrant or summons and affidavit are those of the affiant, that the document received by me is a correct and complete copy of the document submitted by the affiant, and that the information contained in the complaint, warrant, or summons and affidavit is true and correct to the best of the affiant's knowledge.

New Orleans, Louisiana,
this ___27th___ day of January, 2016.

_____
HONORABLE SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE